IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JOAN E. QUINN, Individually and as
Personal Representative of the Estate of
JAMES ALBERT QUINN, Deceased, et al.,

        Plaintiffs,

v.

CONTINENTAL MOTORS, Inc.

        Defendant.

Civil Action No. 15-1005-RGA

## MEMORANDUM OPINION

Joseph J. Farnan, Jr., Joseph J. Farnan, III, Brian E. Farnan, and Michael J. Farnan, FARNAN LLP, Wilmington, DE; Cynthia M. Devers, THE WOLK LAW FIRM, Philadelphia, PA, attorneys for Plaintiffs.

Paul M. Lukoff and Andrea Brooks, WILKS, LUKOFF & BRACEGIRDLE, LLC, Wilmington, DE; Sherri R. Ginger, Mark B. Roberts, and Timothy A. Heisterhagen, ARMBRECHT JACKSON LLP, Mobile, AL, attorneys for Defendant.

March 23, 2020

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

On November 5, 2013, a small airplane crashed in a wooded area in Kirksville, Missouri. (D.I. 222, Ex. A-1, "NTSB Report" at 1). The plane's two occupants, pilot James Quinn and flight instructor Robert Groh, were killed. Quinn's family members brought this wrongful death action under diversity jurisdiction against Defendant Continental Motors, Inc., a Delaware corporation that makes aircraft engines and engine parts. (D.I. 1, 37). Currently before me is Defendant's Motion for Summary Judgment or, in the Alternative, Motion for Partial Summary Judgment (D.I. 221) and Defendant's Motion to Strike Sham Declarations (D.I. 237). I have reviewed the parties' briefing on summary judgment (D.I. 222, 232, 239, 266, 267) and sham declarations (D.I. 238, 242, 243). I heard oral argument on October 22, 2019. (D.I. 264).

Defendant's Motion to Strike Sham Declarations is denied. Because there is no genuine dispute that Plaintiffs' claims are barred by the General Aviation and Revitalization Act (GARA), Defendant's Motion for Summary Judgment is granted.

## I.   BACKGROUND

Quinn and Groh were flying a Piper Saratoga, a six-seat single-engine aircraft, on the day of the crash. (NTSB Report at 1a). They took off from an airport in Colorado and were headed home to Wisconsin, but they planned to stop in Missouri for fuel. (*Id.* at 1). Around 6:12 p.m., their plane collided with trees about 3.5 miles north of the Kirksville airport. (*Id.* at 1, 1b). There is no evidence Quinn or Groh survived the impact. (*See id.* at 1c).

Their aircraft, manufactured by the Piper Aircraft Corporation in 1980, was powered by a six-cylinder Lycoming engine. (D.I. 222, Ex. A, "Horton Aff." ¶¶ 4-5). The engine was equipped with a single-drive dual "magneto," which provides electrical energy to the engine's ignition

1

system. (*Id.* ¶¶ 5-6). Bendix was the original manufacturer of dual magnetos in certain Lycoming engines. (*Id.* ¶ 7). Continental later acquired the Bendix magneto product line and began manufacturing its own dual magnetos. (*Id.*).

Plaintiffs' theory is that the autopilot system malfunctioned, causing the plane to suddenly pitch upwards. (D.I. 220, Ex. G, "Suchocki Report"). Plaintiffs claim the pilot attempted to increase engine power to prevent a stall, but because of a defect in the magneto, the engine failed to produce enough power, causing the crash. (D.I. 231, Ex. C, "Suchocki Dep." at 140:16-141:3). Specifically, Plaintiffs argue the single-drive dual magneto is defectively designed because it lacks redundancy, meaning any failure in the system could prove catastrophic. (D.I. 218, Ex. G, "Seader Report" at 11). Scuff marks on the magneto recovered from the crash scene indicate contact between the rotating magnet and the pole shoes, and this contact would have caused a loss in engine power, according to Plaintiffs. (*Id.*).

## II. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

2

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester, Pa.*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1).

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 247–49. If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

### III. DISCUSSION

#### A. Motion to Strike Suchocki and Seader Declarations

Under the sham affidavit doctrine, "a party may not create a material issue of fact to defeat summary judgment by filing an affidavit disputing his or her own sworn testimony without demonstrating a plausible explanation for the conflict." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004). "[I]f it is clear that an affidavit is offered solely for the purpose of defeating summary judgment, it is proper for the trial judge to conclude that no reasonable jury could

3

accord that affidavit evidentiary weight and that summary judgment is appropriate." *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007).

The Third Circuit Court of Appeals has adopted a "flexible" approach to the sham affidavit doctrine. *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 269 (3d Cir. 2010). "In other words, not all contradictory affidavits are necessarily shams, and when there is independent evidence in the record to bolster an otherwise questionable affidavit, courts generally have refused to disregard the affidavit." *Id.* (cleaned up).

One of Defendant's arguments for summary judgment is that Plaintiffs failed to produce sufficient evidence that the magneto caused the crash. In its opening brief in support of summary judgment, Defendant claimed that "none of Plaintiffs' experts . . . identif[ied] the supposed loss of Engine power as a cause of the Accident." (D.I. 222 at 15). About a month after Defendant filed its summary judgment motion, Plaintiffs' experts John Suchocki, a trained pilot, and Mark Seader, an aircraft mechanic, submitted declarations in which they both explicitly alleged that engine power loss caused the crash. (D.I. 230, "Seader Decl.;" D.I. 231, "Suchocki Decl.").

Defendant has sought to strike those declarations under the sham affidavit doctrine, arguing Plaintiffs only submitted the declarations to defeat summary judgment and that the declarations contradict the experts' own prior sworn testimony. (D.I. 238 at 5). Defendant points to the following passage from Suchocki's deposition:

> Q. Are you offering an opinion in this case as to the cause of the accident?
> A. No. I'm opining as to the failure of two systems. The dual magneto and the pitch trim function of the autopilot.
> Q. And I want to make sure that I understand that. You are offering opinions that the autopilot failed and that the magneto malfunctioned, right?
> A. Yes.
> Q. But you are not offering any opinions as to what the overall cause of this accident was; is that right?

4

> A. That's correct.

(D.I. 223, Ex. H, "Suchocki Dep." at 174:22-175:8).

Similarly, Defendant cites this exchange during Seader's deposition:

> Q. Mr. Seader, in this case, although your report does say that the ignition power loss caused the accident, you are not offering an overall cause of the accident that would include piloting, weather and other factors; is that right?
> A. That is correct.

(D.I. 223, Ex. G, "Seader Dep." at 238:24-239:6).

I do not find that either of these declarations are shams. Both experts issued reports prior to their depositions. In his report, Seader concluded that an engine power loss caused the crash. (Seader Report at 11, "The scuff marks visible on the pole shoes and the heat generated by this contact . . . are sufficient enough to cause intermittent ignition interference in an unpredictable manner . . . ."[T]he ignition interference caused a power loss during the accident flight when the pilots experienced an autopilot malfunction and caused the subject accident."). Suchocki stated an engine power loss "contributed" to the crash. (Suchocki Report, "The magneto rotor assembly was making contact with the pole shoes, which will cause insufficient power such as contributed to the accident."). Both experts stood by those conclusions during their depositions. Defendant's counsel pressed Suchocki and Seader on the fact that they both identified an autopilot malfunction as a factor in the crash and that they could not entirely rule out pilot error or bad weather as other possible factors.

In the passages cited by Defendant, Suchocki and Seader admitted they could not opine on the "overall cause" of the crash. "Overall cause," however, is not a legal term of art. In context, it seems the two experts were acknowledging they did not know for sure that the engine power loss was the only or the predominant factor in the crash. That is not necessary to show

5

causation though. "Delaware recognizes the traditional 'but for' definition of proximate causation." *Duphily v. Delaware Elec. Co-op., Inc.*, 662 A.2d 821, 828 (Del. 1995). That is, Plaintiffs just need to show that Defendant's product was the "direct cause without which [the] accident would not have occurred." *Id.* at 829. "[T]here may be more than one proximate cause of an injury." *Id.*

I do not find that the Suchocki or Seader declarations contradict the experts' testimony about the "overall cause" of the crash. Seader's opinion does not seem to have changed at all. In his declaration, Suchocki claims the engine power loss "caused" the crash, while he wrote in his earlier report that it "contributed" to the crash. I do not find that this subtle shift means "no reasonable jury could accord that affidavit evidentiary weight." *Jiminez,* 503 F.3d at 253. Accordingly, I decline to strike either declaration.

**B. Causation**

With the help of the expert declarations, Plaintiffs have clearly raised a genuine dispute about causation. In his declaration, Seader concluded the "ignition interference caused a power loss during the accident flight when the pilots experienced an autopilot malfunction and caused the subject accident." (Seader Decl. ¶ 8c). Suchocki similarly stated that the "accident was ultimately caused by the engine's inability to respond to the pilot's demands for increased power to respond to an out-of-trim condition." (Suchocki Decl. ¶ 9). These opinions are bolstered by Mark Hood, a materials engineer, who concluded, based on scuffing within the magneto, that the rotor and pole shoes made contact. (D.I. 216, Ex. B, "Hood Report" at 3). Although there may have been other factors that contributed to the crash (particularly an autopilot malfunction), Plaintiffs have demonstrated there is a genuine dispute that the magneto was a proximate cause of the crash.

6

Even without the Suchocki and Seader declarations though, I would find Plaintiffs' causation theory survives summary judgment. In Seader's report, he concluded that scuff marks on the magneto indicate that the engine lost power and that this power loss caused the crash. (Seader Report at 11). According to Seader, if the engine had a redundant design, it would not have lost power. (*Id.*). Hood's report supports Seader's conclusion about the scuff marks. (Hood Report at 3). Viewing this evidence in the light most favorable to Plaintiffs, I find a reasonable jury could agree with these experts and return a verdict for Plaintiffs.

Defendant further argues that Plaintiffs "cannot affirmatively identify Continental as the designer or manufacturer of the magneto." (D.I. 222 at 14). While the magneto was overhauled by a company called Kelly Aerospace, the original equipment manufacturer (OEM) serial number on the magneto indicates it was produced by Continental. (D.I. 223, Exh. J, "Kelly Dep." at 137:7-139:4). That is enough evidence to create a genuine dispute that Continental manufactured this aircraft part.

### C. General Aviation Revitalization Act

Defendant argues Plaintiffs' claims are barred by the General Aviation Revitalization Act (GARA), Pub.L. No. 103-298, 108 Stat. 1552 (codified at 49 U.S.C. § 40101 notes). Congress passed GARA in 1994 to ease the burden of tort lawsuits on aircraft manufacturers. "[Congress] believed that manufacturers were being driven to the wall because, among other things, of the long tail of liability attached to those aircraft, which could be used for decades after they were first manufactured and sold." *Lyon v. Agusta S.P.A.*, 252 F.3d 1078, 1084 (9th Cir. 2001). GARA establishes an eighteen-year statute of repose for claims against aircraft manufacturers. If an accident occurs after the GARA period for that aircraft has run, "no action whatsoever is possible." *Id.* The law provides:

> [N]o civil action for damages for death or injury to persons or damage to property arising out of an accident involving a general aviation aircraft may be brought against the manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft, in its capacity as a manufacturer if the accident occurred—
> (1) after the applicable limitation period beginning on—
> (A) the date of delivery of the aircraft to its first purchaser or lessee, if delivered directly from the manufacturer; or
> (B) the date of first delivery of the aircraft to a person engaged in the business of selling or leasing such aircraft; or
> (2) with respect to any new component, system, subassembly, or other part which replaced another component, system, subassembly, or other part originally in, or which was added to, the aircraft, and which is alleged to have caused such death, injury, or damage, after the applicable limitation period beginning on the date of completion of the replacement or addition.

GARA § 2(a).

The law defines the "limitation period" as 18 years. GARA § 3(3). A "general aviation aircraft" means an aircraft with a maximum seating capacity of fewer than 20 passengers and which was not engaged in scheduled passenger-carrying operations at the time of the accident. GARA § 2(c). The parties do not dispute that the six-seat Piper Saratoga that crashed in this case was a "general aviation aircraft." (*See* D.I. 222 at 16-17; D.I. 232 at 6-15). That aircraft was delivered to its first purchaser on November 3, 1980—almost 33 years before the accident. (Horton Aff. ¶ 4). Therefore, the statute of repose for the aircraft as a whole has run.

GARA, however, contains a "rolling" provision. Under this provision, if a "new component, system, subassembly or other part which replaced another component, system, subassembly or other part originally in . . . the aircraft" is alleged to have caused the crash, then the statute of repose begins "on the date of completion of the replacement or addition." GARA § 2(a)(2). The parties do not dispute that the magneto at issue in this case was first installed on the Piper Saratoga on or about June 17, 2004. (*See* D.I. 233-2, Exh. B).

The critical question then is whether the magneto that Plaintiffs allege caused the crash was a "new" part that restarted the limitation period. The magneto recovered from the crash scene had two serial numbers on it. (D.I. 222, Ex. A-5). The first serial number, E050845, indicates that the magneto was "overhauled" by Kelly Aerospace in 2004. (D.I. 223, Ex. J, "Kelly Dep" at 137:20-138:13). The second serial number, G02FA043R, was assigned by Continental to a "rebuilt" dual magneto. (*Id.*). The parties agree that the rebuild occurred in 2002 (D.I. 222 at 5; D.I. 266 at 6), although neither cites to any documentary or testimonial evidence to that effect.

The question of whether an aircraft part is "new" is somewhat akin to the ship of Theseus, the planks of which were replaced one by one over the years until none of the original timber remained. Philosophers have puzzled for centuries over whether it remained the same ship. My role here though is not to resolve a philosophical debate, but rather, "to give effect to Congress's intent." *In re Lord Abbett Mut. Funds Fee Litig.,* 553 F.3d 248, 254 (3d Cir. 2009). "[E]very exercise of statutory interpretation begins with an examination of the plain language of the statute." *United States v. Diallo*, 575 F.3d 252, 256 (3d Cir. 2009). "If the intent of Congress is clear, that is the end of the matter." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). "Where the statutory language does not express Congress' intent unequivocally, a court traditionally refers to the legislative history and the atmosphere in which the statute was enacted in an attempt to determine the congressional purpose." *United States v. Williams*, 675 F.3d 275, 278 (3d Cir. 2012). "[C]ourts should interpret a law to avoid absurd or bizarre results." *In re Kaiser Aluminum Corp.*, 456 F.3d 328, 338 (3d Cir. 2006).

Courts have consistently held that an overhauled part is not "new" for purposes of GARA's rolling provision. *Robinson v. Hartzell Propeller Inc.*, 326 F. Supp. 2d 631, 663-64

9

(E.D. Pa. 2004); *Moore v. Hawker Beechcraft Corp.*, 2011 WL 6400670, at \*9 (Del. Super. Ct. Dec. 15, 2011), *aff'd*, 74 A.3d 654 (Del. 2013); *Hinkle v. Cessna Aircraft Co.*, 2004 WL 2413768, at \*9 (Mich. Ct. App. Oct. 28, 2004). One court has stated that an "overhauled" part is one that "is removed for maintenance and returned to the aircraft." *Robinson*, 326 F. Supp. 2d at 663. But, at least as used in this case, an "overhauled" part is not necessarily returned to the same aircraft as the one from which it was removed. (Kelly Dep., at 60:6-66:16, 67:5-68:13) (describing the two different ways Kelly overhauled parts).

If an overhauled part could restart the limitation period, it would "effectively eviscerate the statute of repose" because "aircraft are required by statute to be routinely overhauled, and certain critical parts must be repaired or replaced on a regular basis." *Robinson*, 326 F. Supp. 2d at 663 (internal citation omitted). The 18-year statute of repose would keep restarting due to the actions of third-party repair companies. Manufacturers could never be sure a part was free from liability, no matter how old it was. Congress would not have created a liability shield that would be rendered meaningless by routine maintenance. Accordingly, I conclude the 2004 overhaul of the magneto by Kelly Aerospace did not trigger GARA's rolling provision.

If the 2004 overhaul had incorporated a new rotor assembly and housing which contained the pole shoes (the parts which, according to Plaintiffs' experts, caused the crash), then the rotor assembly and the housing which contained the pole shoes would be new components, and the rolling provision would apply. *See Moore* 2011 WL 6400670, at \*9 (explaining that the rolling provision only applies if "the new item was also a cause of the claimed damages."). But there is no evidence that the rotor assembly, housing, and pole shoes were new. Indeed, the evidence is that they were reused from the 2002 rebuilt magneto. (Kelly Dep., at 149:23-150:10, 150:22-151:4).

10

I turn then to the 2002 rebuild of the magneto. Unfortunately, there is little evidence in the record on what exactly the "rebuilt" magneto in this case was. Were some pieces re-used from other magnetos? How old were those pieces? How does a rebuilt part differ, if at all, from a new part in testing, price, and warranty? Despite the supplemental briefing, the record has no answers. Three things are clear though. One, since Continental did whatever work was involved in the rebuild itself (Kelly Dep. at 137:20-138:13), that fact distinguishes this case from the cases about overhauled parts. Two, no one refers to the rebuilt magneto as a "new" magneto. Three, common usage of the word "rebuilt" suggests that whatever it is that Continental did in 2002, Continental would have been rebuilding with used parts to the extent possible.

Federal regulations provide some insight into what a "rebuilt" aircraft part is. Under 14 C.F.R. § 43.3(j), "[a] manufacturer may . . . [r]ebuild or alter any . . . aircraft engine . . . manufactured by him . . . [or] [r]ebuild or alter any . . . part of . . aircraft engines . . . manufactured by him." Overhauling and rebuilding are distinguished in section 43.2; the main difference is that, unlike an overhauled part, a rebuilt part must be "tested to the same tolerances and limits as a new item, using either new parts or used parts that either conform to new part tolerances and limits or to approved oversized or undersized dimensions." 14 C.F.R. § 43.2. Thus, I understand a rebuilt part has to be "like new," whereas an overhauled part does not have to be "like new."

As a threshold matter, Continental can only seek refuge behind GARA if it is the "manufacturer of the aircraft or the manufacturer of any new component, system, subassembly, or other part of the aircraft." GARA § 2(a). If, for example, a negligent repair of a part causes a crash, the victims can sue the repair company because the repair company is not a "manufacturer" of the aircraft or any part of the aircraft. *Robinson*, 326 F. Supp. 2d at 663.

11

Plaintiffs appear to concede that Continental qualifies as a manufacturer under GARA. (*See* D.I. 232 at 11-13; D.I. 266 at 2). Federal regulations support this conclusion because it appears only a "manufacturer" can "rebuild" an aircraft part. 14 C.F.R. § 43.3(j). Thus, I conclude Continental is a "manufacturer."

Is Continental the manufacturer of "the aircraft" or a "new" part of the aircraft under GARA § 2(a)? In *U.S. Aviation Underwriters Inc. v. Nabtesco Corp.*, the court held that the manufacturer of any "component parts" of an aircraft (whether those parts are new or not) qualifies as the manufacturer of "the aircraft" under GARA § 2(a). 697 F.3d 1092, 1098 (9th Cir. 2012). "Congress[] . . . [intended] that GARA's period of repose . . . apply with equal force to all the component parts of an aircraft involved in an accident, regardless of whether they were new or used when installed." *Id.* at 1097. Given that Plaintiffs have not disputed this point, I conclude Continental qualifies as a "manufacturer" of the rebuilt magneto under GARA § 2(a), and the critical question then is whether the rolling provision, GARA § 2(a)(2), has been triggered.

Defendant argues that the word "new" in GARA § 2(a)(2) means "brand new" and excludes rebuilt parts. (D.I. 222 at 18). I am forced to agree. As Defendant points out, the rolling provision requires that the part at issue be a replacement part. The rolling provision further requires that the replacement part be "new." Ordinary principles of statutory construction support Defendant's argument. Some replacement parts are new; others are not. Plainly, a rebuilt part is not the same as a new part. I am bound by the literal words of the statute. Even though federal regulations require rebuilt parts to meet the same tolerances and limits as new parts, that does not transform rebuilt parts into new parts and no one apparently refers to them as such.

This reading of the statute arguably leads to a peculiar result. Unlike with repairs or overhauls, the manufacturer itself controls when a part is rebuilt. No third party has intervened to

12

extend liability. There is no concern here of an endlessly restarting limitation period. "Congress's reasons for adding the word 'new' are plain: it wished to ensure that the 'rolling' period of repose could only be triggered by the replacement or addition of a new component part, as opposed to a used component part. Without this amendment, the replacement or addition of any used component part would have reset the rolling limitation period under § 2(a)(2), thus exposing the part manufacturer to a whole new period of liability." *U.S. Aviation Underwriters*, 697 F.3d at 1100.

I cannot rewrite the statute even though I think the statute as Plaintiffs want to interpret it would make more sense as policy. The literal interpretation of a statute might lead to a "peculiar" outcome without that outcome being "so outlandish as to constitute an absurd or bizarre result." *Encompass Ins. Co. v. Stone Mansion Rest. Inc.*, 902 F.3d 147, 153–54 (3d Cir. 2018). "Reasonable minds might conclude that . . . [a] result demonstrates a need for a change in the law; however, if such change is required, it is Congress — not the Judiciary — that must act." *Id.* at 154.

While there is no reason to think Congress intended to make rebuilt parts entirely immune from liability from the moment they were produced, that would not be the consequence of this interpretation of the statute. The manufacturer, while not liable as the manufacturer, and, for example, not liable for a defective design, would still face liability for negligence akin to what an overhauler would face, that is, for example, liability for negligent workmanship.

Defendant correctly notes that the weight of authority suggests that Plaintiffs bear the burden of showing that GARA's rolling provision was triggered. *See Agape Flights, Inc. v. Covington Aircraft Engines, Inc.*, 2011 WL 2560281, at *5 (E.D. Okla. June 28, 2011); *Willett v. Cessna Aircraft Co.*, 851 N.E.2d 626, 636 (Ill. App. Ct. 2006); *Hetzer-Young v. Precision*

13

*Airmotive Corp.*, 921 N.E.2d 683, 691 (Ohio Ct. App. 2009). Because this is summary judgment, Plaintiffs' burden is to show there is a genuine dispute of material fact. *LeBlanc v. Panther Helicopters, Inc.*, 2016 WL 1161274, at *4 (E.D. La. Mar. 23, 2016) ("Plaintiffs bear the burden of producing sufficient evidence to raise a genuine dispute of material fact regarding the applicability of the rolling provision."); *Sulak v. Am. Eurocopter Corp.*, 2012 WL 6567237, at *4 (N.D. Tex. Dec. 17, 2012) ("[Plaintiffs] bear the burden of producing sufficient evidence to raise a genuine dispute of material fact regarding the applicability of the rolling provision.")

I find that Plaintiffs have not met this burden of production. The record contains no evidence that any of the parts of the magneto that are at issue in this case, namely, the rotor assembly, magneto housing, and pole shoes, were new when installed in 2004 or when rebuilt in 2002. Even when viewing this evidence in the light most favorable to Plaintiffs, I conclude there is no evidence at all that this magneto was a "new" part, or that any of its components were "new" parts. Under GARA's rolling provision, the 18-year limitation period began in 1980, as there is no basis for a later limitation based on a "new component" which replaced another component. Because the crash was in 2013, Plaintiffs have not presented sufficient evidence to defeat summary judgment on the basis of GARA's rolling provision.

Plaintiffs additionally argue that GARA's fraud exception saves their claims. This exception provides that GARA's statute of repose does not apply if:

> [T]he claimant pleads with specificity the facts necessary to prove, and proves, that the manufacturer with respect to a type certificate or airworthiness certificate for, or obligations with respect to continuing airworthiness of, an aircraft or a component, system, subassembly, or other part of an aircraft knowingly misrepresented to the Federal Aviation Administration, or concealed or withheld from the Federal Aviation Administration, required information that is material and relevant to the performance or the maintenance or operation of such aircraft, or the component, system, subassembly, or other part, that is causally related to

the harm which the claimant allegedly suffered;

GARA § 2(b)(1).

Plaintiffs point to 14 C.F.R. § 21.3, which requires aircraft part manufacturers to report malfunctions or defects in their products to the FAA under certain circumstances. Plaintiffs argue that the magneto was defective, and because Continental did not report this defect to the FAA, the company "knowingly misrepresented" information to the FAA or "concealed or withheld" information from the FAA. (D.I. 232 at 12-13). Plaintiffs allege, "Continental has engaged in a pattern of concealment and misrepresentation of material information from the FAA." (*Id.* at 15).

GARA § 2(b)(1), however, requires that the claimant "pleads with specificity the facts necessary to prove, and proves" misrepresentation. Plaintiffs' conclusory allegation that Continental engaged in a "pattern of concealment and misrepresentation" is plainly not enough. Additionally, the reporting obligation Plaintiffs cite only applies if the manufacturer "determines" that the defect resulted in certain "occurrences," such as an engine failure. 14 C.F.R. § 21.3(a). Plaintiffs have not provided any evidence of such "occurrences" or the failure to report them. A plaintiff cannot trigger GARA's fraud exception by merely alleging that a manufacturer "failed to meet a required standard of care." *Burton v. Twin Commander Aircraft LLC*, 254 P.3d 778, 790 (Wash. 2011). That is, essentially, all Plaintiffs have done here. They have not offered any specific facts about misrepresentation or concealment, much less offered any evidence to prove such conduct. The only citations to evidence in the briefing are to the Seader declaration, but it does not address any evidence of misrepresentations or concealment from the FAA. (*See* D.I. 232 at 13 (citing paragraphs 17 to 35 of the Seader declaration at D.I. 230)). Therefore, I find Plaintiffs have not shown that an exception to GARA applies, and the

15

statute bars their claims. I will proceed though to consider Defendants' other summary judgment arguments.

### D. Successor Liability

Defendant argues it is entitled to summary judgment because it is not liable as a successor-in-interest to Bendix. (D.I. 222 at 11-12). "In Delaware, when one company sells or otherwise transfers all of its assets to another company, the buyer generally is not responsible for the seller's liabilities, including claims arising out of the seller's tortious conduct." *Ross v. Desa Holdings Corp.*, 2008 WL 4899226, at *4 (Del. Super. Ct. Sept. 30, 2008).

Plaintiffs' theory, however, is not that Continental is liable for Bendix's tortious conduct. Rather, Plaintiffs allege that Continental itself produced a defective magneto. Bendix may have produced the original magneto that was in the plane when it was manufactured in 1980. The record indicates though that the magneto in the plane when it crashed was "rebuilt" by Continental in 2002. (Kelly Dep. at 137:20-138:13). Accordingly, while Continental is not liable as a successor-in-interest, it does not matter as there is a genuine dispute of material fact that Continental is liable for this aircraft part for its own actions (if the claims were not barred by GARA).

### E. Judicial Estoppel

The doctrine of judicial estoppel seeks to prevent litigants from gaining an advantage by asserting incompatible positions in the same proceeding or in different proceedings. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). "It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from playing 'fast and loose with the courts.'" *Id.* Judicial estoppel is appropriate if: 1) the party to be estopped has taken two positions that are "irreconcilably

16

inconsistent;" 2) that party changed his or her position in bad faith; and 3) judicial estoppel is "tailored to address the harm identified" and "no lesser sanction would adequately remedy the damage done by the litigant's misconduct." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 779-80 (3d Cir. 2001).

Defendant argues Plaintiffs have taken positions here that are incompatible with positions they have taken during litigation over this crash in Wisconsin and Connecticut. (D.I. 222 at 20). The Wisconsin and Connecticut actions focused on the autopilot system (*see* D.I. 222, Ex. B; D.I. 223, Ex. C, Ex. M), while this action is focused on the magneto. Plaintiffs, however, have not abandoned their theory that the autopilot malfunctioned. Their theory is that the autopilot malfunction would not have been fatal if the engine had produced enough power. I am not convinced that Plaintiffs have taken "irreconcilably inconsistent" positions, and even if they have, Defendant has not provided any evidence that the positions were taken in bad faith or that judicial estoppel is tailored to address the harm. Judicial estoppel is therefore not appropriate here.

### F. Partial Summary Judgment

Defendant argues it is entitled to summary judgment on the following specific claims under Delaware law: strict liability, negligent infliction of emotional distress, the survival action on behalf of the Decedent's estate, claims for punitive damages, breach of warranty, and the claims by Plaintiffs except for Joan Quinn in her capacity as the personal representative of James Quinn's estate. (D.I. 222 at 21-25). Plaintiffs did not contest these arguments. (D.I. 232). Thus, even if GARA did not bar Plaintiffs' claims entirely, summary judgment for these specific claims would still be warranted.

17

## IV. CONCLUSION

For the reasons stated above, Defendant's Motion to Strike Sham Declarations (D.I. 237) is DENIED. Defendant's Motion for Summary Judgment (D.I. 221) is GRANTED. I will enter an Order consistent with this Opinion.